# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Jun 01, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| JESSICA TANG | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Case No.   2:22-mj-0085 JDP

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 21, 2020___ in the county of ___Placer___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent John Ogden

☑ Continued on the attached sheet.

_/s/ John Ogden_
*Complainant's signature*

John Ogden, FBI Special Agent
*Printed name and title*

Sworn to and signed before me telephonically.

Date:   ___06/01/2022___

_Jeremy Peterson_
*Judge's signature*

City and state:   ___Sacramento, California___

United States Magistrate Judge Jeremy D. Peterson
*Printed name and title*

1  PHILLIP A. TALBERT
   United States Attorney
2  BRIAN A. FOGERTY
   JUSTIN L. LEE
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5  Facsimile:  (916) 554-2900

6
   Attorneys for Plaintiff
7  United States of America

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,                    CASE NO.

12                              Plaintiff,       **<u>UNDER SEAL</u>**

13              v.                               AFFIDAVIT IN SUPPORT OF CRIMINAL
                                                 COMPLAINT
14  QUINTEN GIOVANNI MOODY,
        a.k.a. Christano Rossi,
15  MYRA BOLECHE MINKS, and
    JESSICA TANG,
16
                            Defendants.
17

18

19          I, John W. Ogden, being duly sworn, hereby depose and state:

20          1.      This affidavit is in support of criminal complaints and a request for arrest warrants for:

21  Quinten Giovanni MOODY, a.k.a. Christano Rossi; Myra Boleche MINKS; and Jessica TANG.  The

22  facts set forth herein establish that the defendants have committed the following federal law violations:

23              a.  <u>Count One</u>:  Beginning on a date unknown, but no later than in or around June 2017,

24                  and continuing to at least November 17, 2021, in the County of Placer, in the State

25                  and Eastern District of California and elsewhere, Quinten Giovanni MOODY and

26                  Myra Boleche MINKS, conspired to distribute marijuana, in violation of 21 U.S.C. §§

27                  846 and 841(a)(1) (Conspiracy to Distribute Marijuana [at least 100 kilograms]).

28              b.  <u>Count Two</u>:  On or about April 13, 2020, in the County of Placer, in the State and

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT                    1

Eastern District of California and elsewhere, Myra Boleche MINKS falsely assumed and pretended to be an officer or employee acting under the authority of the United States, or a department, agency, or officer thereof, to wit, "Amanda Wilkins," a purported Drug Enforcement Administration ("DEA") Special Agent, in violation of 18 U.S.C. § 912 (False Personation of Officer or Employee of the United States).

c.   Count Three:  On or about April 27, 2020, in the County of Placer, in the State and Eastern District of California and elsewhere, Myra Boleche MINKS falsely assumed and pretended to be an officer or employee acting under the authority of the United States, or a department, agency, or officer thereof, to wit, "Cynthia Lee," a purported Assistant United States Attorney for the Northern District of California, in violation of 18 U.S.C. § 912 (False Personation of Officer or Employee of the United States).

d.   Count Four: Between on or about May 17, 2021, and on or about May 23, 2021, in the State and Eastern District of California and elsewhere, Myra Boleche MINKS, with Quinten Giovanni MOODY aiding and abetting, falsely represented herself as an officer, agent, or employee of the United States, to wit, "Betty Yu," a purported law enforcement officer of the United States Department of Justice, and in that assumed character conducted a search of data which was located at the premise of Phone Company 1, in violation of 18 U.S.C. §§ 913 (Impersonator Making Search) and 2 (aiding and abetting).

e.   Count Five: On or about August 21, 2020, in the State and Eastern District of California and elsewhere, Myra Boleche MINKS and Jessica TANG, devised a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises, to wit, submitting a false claim for unemployment benefits to the California Employment Development Department ("EDD") purportedly on behalf of Victim D.A., and thereby causing the mails to be used to carry out an essential part of the scheme, in violation of 18 U.S.C. § 1341 (Mail Fraud).

f.   Count Six: Between on or about May 8, 2022, and on or about May 21, 2022, Quinten

Giovanni MOODY and Myra Boleche MINKS, attempted to influence, obstruct, or impede the due administration of justice in Eastern District of California case numbers 2:22-SW-275-CKD and 2:22-SW-276-CKD, in violation of 18 U.S.C. § 1503 (Attempted Obstruction of Justice).

## AGENT BACKGROUND

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since 2009. I am currently assigned to the Sacramento Division of the FBI, where I investigate various federal crimes, including offenses involving drug trafficking and fraud. I have received training at the FBI Academy in Quantico, Virginia, and learned about the methods of drug trafficking and various fraud schemes through my investigative work and collaboration with other law enforcement officers.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. This affidavit is based upon my own personal knowledge but also the knowledge of other law enforcement officers involved in this investigation.

## STATEMENT OF PROBABLE CAUSE

### The Moody-Minks Organization

4. The Moody-Minks Organization is a criminal organization whose members and associates engage in, among other things, drug trafficking, fraud, and the impersonation of federal law enforcement officers. The organization operates throughout California, Georgia, Nevada, Texas, and elsewhere. Some of the organization's operations took place in, and were overseen within, the State and Eastern District of California.

A. **Count One: Conspiracy to Distribute Marijuana, in violation of 21 U.S.C. § § 846, 841(a)(1)**

    i. **On May 12, 2017, a Moody-Minks marijuana courier was arrested at Hartsfield-Jackson Atlanta International Airport transporting marijuana from California to Georgia.**

5. On May 12, 2017, a U.S. Customs and Border Protection ("CBP") canine at Hartsfield-Jackson Atlanta International Airport alerted on two checked bags that had arrived on Delta Airlines flight number 147. The flight had originated in Oakland, California. The bags were placed on the

baggage carousel and Moody-Minks Associate 1 (hereinafter, "Associate 1") was observed retrieving the bags.  When an FBI agent asked Associate 1 if the bags belong to him, Associate 1 showed the agent his cell phone, which displayed a photo of the bags and baggage tag.  Associate 1 further stated that the bags belonged to his wife, and later falsely claimed that he was attempting to steal the bags.  A Georgia state court judge subsequently signed a warrant authorizing the seizure and subsequent search of the bags.  During the search, law enforcement officers found approximately 31.62 pounds of marijuana in vacuum sealed plastics bags.  Associate 1 was later convicted of possession of marijuana with intent to distribute in the Northern District of Georgia.

6.      On June 23, 2018, Associate 1 was interviewed by federal agents pursuant to a proffer agreement.  Under the terms of the agreement, the government agreed not to use Associate 1's statements against him in any subsequent criminal prosecution, although the statements could be used by investigators to gather other evidence to be used against Associate 1 and others.  During the interview, Associate 1 told agents that another associate, Associate 5, coordinated the shipment of marijuana from California to Georgia.  Associate 1 would pick up bags from the airport and bring them to an Atlanta area apartment complex where he would meet Associate 5.  Associate 5 was usually with a group of men, including MOODY.  Associate 1 identified a photo of MOODY and indicated that he knew him as "Q."

7.      During the June 23 interview, Associate 1 further explained that he had recently picked up two or three bags of marijuana per week.  However, in November and December of 2016, he was picking up bags every four weeks.  Associate 1 indicated that he had traveled to the San Francisco area twice and during those trips he delivered money to California and brought marijuana back to Georgia.  At the time, marijuana cost approximately $1,500 per pound in California, and it would be sold for $2,600 per pound in Georgia.

8.      On October 11, 2017, Associate 1 again met with federal agents pursuant to the terms of the above-described proffer agreement.  Associate 1 acknowledged that he had not been completely honest during his prior interview with investigators.  Associate 1 reiterated that Associate 5 and MOODY were mainly responsible for the bags containing marijuana that were checked in or placed on flights from Oakland and San Francisco to Atlanta.  Associate 1 acknowledged that since the prior

interview, he received bags of marijuana from the airport at least twice.  Associate 1 described how another associate, Person 3, picked up the bags of marijuana at Hartsfield-Jackson Atlanta International Airport and delivered them to Associate 1's home.  Then, another associate, Person 4, picked up the bags and delivered them to MOODY in the Atlanta area.  MOODY had introduced Associate 1 to Person 4 approximately two years prior.

9.     During the October 11 interview, Associate 1 also acknowledged that when law enforcement searched his home on September 28, 2017, they found marijuana that belonged to Associate 5.

ii.     **On March 19, 2019, MINKS told Placer County Deputy Sheriff that she distributes marijuana.**

10.     On March 12, 2019, Placer County sheriff's deputies responded to a complaint of suspicious activity at a residence in Loomis, California (hereinafter, the "Loomis property").  During the ensuing investigation, deputies learned that MINKS was renting the residence using a fictitious identity, hereinafter described as "A.T."  Along with the rental application for the Loomis property, MINKS submitted a purported California driver's license in the name of A.T., which contained a photo of MINKS.

11.     On March 19, 2019, deputies knocked on the door of the Loomis property, but no one answered.  The deputies smelled a strong odor of marijuana and noticed several suitcases sitting in front of the residence.  The suitcases had tags containing the name of the fictitious identity, A.T.

12.     A Placer County Sheriff's Office detective observed MINKS return to the residence then leave again in a Mercedes.  When MINKS left the Loomis property, detectives followed her and conducted a traffic stop after observing MINKS fail to stop at a red light.  When contacted by the detectives, MINKS initially told detectives that A.T. was a real person.  She explained that A.T. was her cousin who lived in the Philippines.  Later in the contact, MINKS stated that A.T. was not a real person.  MINKS also explained that she was a partner in a marijuana farm in Mendocino County.  She indicated that she earned $5,000 per month, and that she had a silent partner.  MINKS later stated that the marijuana business is conducted under the business name Exclusive Consulting LLC.  She also identified two other associates who were affiliated with the company, and stated that she was actually

paid approximately $11,000 per month.

13.     During the March 19, 2019, contact with Placer County Sheriff's Office detectives, MINKS was arrested.  During her arrest, detectives found her to be in possession of approximately $47,000 in U.S. currency, a fake California driver's license in the name of A.T., credit card manufacturing materials, credit cards issued in other names, and airline tickets in other people's names. She also possessed a strong magnet and anti-theft tag remover, which are items that are similar to those commonly used by department store employees to remove security devices from merchandise.

14.     Law enforcement officers subsequently searched the Loomis property, pursuant to a state search warrant.  During the search, officers found pay-owe sheets, marijuana, and marijuana packaging materials.  Based on my training and experience, I know that these items are commonly used by individuals engaged in the distribution of marijuana.  Law enforcement officers also found a lease report and contract for a residence located at 2260 Abbeyhill Road in Lincoln, California (hereinafter, the Abbeyhill Road property").

iii.     **On May 8, 2019, law enforcement seized approximately 5 lb. of marijuana from MINKS' Placer County residence.**

15.     On May 8, 2019, a Washoe County (Nevada) deputy sheriff contacted the Placer County Sheriff's Office to alert Placer County law enforcement that a warrant had been issued for MINKS' arrest.  After receiving that information, a Placer County Sheriff's Office detective (hereinafter, "PCSO detective") confirmed that MINKS was then on probation in Placer County and subject to state-court-ordered search and seizure conditions.

16.     The PCSO detective went to MINKS' residence, which was located at 2260 Abbeyhill Road in Lincoln, California (i.e., the Abbeyhill property).  When he arrived, he searched the residence's garage.  In the garage, the PCSO detective found a blue storage bin containing five separately packed bundles of marijuana.  The PCSO detective estimated that each bundle weighed approximately 1 pound.

17.     The PCSO detective and other law enforcement officers searched MINKS' master bedroom.  In that room they found an open notebook.  The notebook contained handwritten columns listing quantities.  Based on my training and experience, I know that drug traffickers often maintain ledgers containing records regarding drug sales.  The notebook was consistent with a drug sale ledger.

18.     The PCSO detective also searched MINKS' purse.  In the purse, he found $4,898.  The currency consisted of $100 and $20 bills that were folded and banded.  Based on my training and experience, I know that currency organized in this way—which accompanies large quantities of marijuana—is indicative of marijuana trafficking.

     iv.     **On May 22, 2021, Moody-Minks Associate 2 was arrested at Reno-Tahoe Airport transporting 75 pounds of marijuana to Las Vegas; MINKS impersonated a JSX employee to facilitate the marijuana shipment.**

19.     On May 22, 2021, Moody-Minks Associate 2 attempted to board a JSX Airlines flight from Reno to Las Vegas.  Airline personnel asked Associate 2 about her luggage and her responses gave airline personnel reason to believe that Associate 2 was attempting to hide something in her luggage. Airline personnel looked in Associate 2's luggage and observed what appeared to be marijuana.  Airline personnel then called airport police.  While waiting for airport police, a JSX employee received a telephone call from a person who identified herself as "Kim."  The same caller later identified herself as "Sabrina"  (hereinafter, "Kim/Sabrina").  Kim/Sabrina claimed to be from the JSX Airlines headquarters. Kim/Sabrina told JSX employees that she needed Associate 2 to continue on the flight from Reno to Las Vegas.  Kim/Sabrina said that there was a confidential, top-secret investigation into Associate 2 and Las Vegas Police were waiting to arrest Associate 2 in Las Vegas.  According to JSX airline personnel, the call from Kim/Sabrina appeared to come from phone number (800) 435-9579 (hereinafter, "Ext. 9579").  According to the JSX Airlines website, Ext. 9579 is the contact number for JSX Airlines customer service.

20.     MINKS was the person posing as JSX employee Kim/Sabrina.  On June 21, 2021, the Honorable Carolyn K. Delaney authorized a federal search warrant for MINKS' 2021 Mercedes coupe. On June 22, 2021, agents found the Mercedes coupe in Roseville, California, and searched the car pursuant to the warrant.  During the search, law enforcement officers seized four cellular telephones. One of the cell phones was an Apple iPhone that belonged to MINKS, which was assigned FBI evidence item number 1B38.

21.     During a search of FBI evidence item number 1B38, I found that a certain cell phone application was installed on the device (hereinafter, "Application 1").  Application 1 enables the user to make a voice call and alter the caller ID that is visible to recipient of the call.  While reviewing the data

associated with Application 1, I found that on one occasion, the person using evidence item 1B38 used Application 1 to place a call purporting to be from Ext. 9579—the number from which Kim/Sabrina called.

> v.   **Associate 2 was transporting approximately 75 pounds of marijuana for the Moody-Minks Organization.**

22.   Law enforcement officers from the Reno-Tahoe Airport Authority Police Department arrived and contacted Associate 2.  Associate 2 consented to a search of her luggage.  Law enforcement officers opened her luggage and found a large quantity of plastic bags that were labeled as "Bubba Kush."  Based on my training and experience, I know that the term "bubba kush" can refer to a variety of marijuana.  In total, law enforcement officers seized 67 individual bags of marijuana that contained a total of approximately 75 pounds of marijuana.

23.   Associate 2 was arrested.  Law enforcement officers seized Associate 2's cell phone incident to her arrest.  The cell phone that law enforcement seized from Associate 2 was transferred to FBI custody.  The device was assigned FBI evidence item number 1B46.

> vi.   **MINKS directed Associate 2 to transport the marijuana.**

24.   On June 22, 2021, during the federal-warrant-authorized search of MINKS' Mercedes coupe in Roseville, California, law enforcement officers seized another Apple iPhone that belonged to MINKS, which was assigned FBI evidence item number 1B39.  Several text messages on 1B39 indicate that MINKS and Associate 2 were working together to distribute marijuana:

> a.   On May 22, 2021, there is an outgoing text message stating, "I just left Vegas.  The girl was supposed to come today.  Use jsx, you know that airline: but she left from Reno and she's a black girl so they hit her."
>
> b.   Also on May 22, 2021, another outgoing text to a suspected marijuana supplier states, "Jason It's been a long time that I take airport Lately I send in a box in a crate.  Takes 2-3 days to get there.  Today she pack because she bring on plane.  She go to jail.  I loose every dollar.  Any way you can send 100 and you make $1750-$1850 Off each one? My transportation with the fright [freight] is ok."
>
> c.   On May 24, 2021, two days after law enforcement stopped Associate 2 and seized the

75 pounds of marijuana, there is an outgoing text from the cell phone seized from MINKS' car, stating, "I lose 240 k and girl go to jail." A booking photo of an African American female was also sent via text, followed by a text stating, "Look how she look." The African American female in the booking photo is Associate 2. I recognize Associate 2 because I have seen her in-person, and I have seen a photo of Associate 2 on a counterfeit Texas driver's license that was found in MINKS' possession on June 22, 2021.

25.     During review of MINKS' cell phone identified as FBI item 1B38, I found an audio recording containing two voices. The audio file containing the recording is dated March 20, 2021, which is two days before Associate 2 and the 75 pounds of marijuana were found at the Reno-Tahoe Airport. After having spoken to both MINKS and Associate 2, I recognized their respective voices as the two voices that are audible on the recording.

26.     In the recording, Associate 2 is arguing with MINKS about the amount of money MINKS paid her per trip. MINKS responded by saying that she paid Associate 2 $1,000 to $1,500 every week. Associate 2 disputed that she was paid every week. Associate 2 reminded MINKS that she (MINKS) said that "Q" pays $1,500 a trip. I know from this investigation, including Associate 1's statements, that "Q" is a nickname for Quinten MOODY. In the recording, Associate 2 tells MINKS that she (Associate 2) is not a snitch. MINKS asks Associate 2 what she (Associate 2) could say. MINKS indicates that she does not care if Associate 2 is "bringing packs" all across the country, indicating that no one put a gun to Associate 2's head to force her to transport marijuana. I know from my training and experience and through this investigation that "packs" is a reference to packages of marijuana.

vii.     **Associate 2's text message indicate that the Moody-Minks Organization transports marijuana to Detroit.**

27.     On July 29, 2021, the Honorable Jeremy D. Peterson authorized a federal search warrant for the cell phone that law enforcement at the Reno-Tahoe Airport seized from Associate 2 on May 22, 2021. The cell phone contains a screenshot of the following text message conversation between the owner of the phone, Associate 2, and an unidentified person.[2] The messages describe the Moody-Minks

---

[2] The cell phone identified as evidence item number 1B46 contains evidence indicating that it

Organization's practice of shipping marijuana in large crates:

> **Associate 2:**  Driving these packs to concord wby
>
> **Unidentified:** Why.  Who There
>
> **Associate 2:**   The person that's gonna pack these into a crate
>
> **Unidentified:** Oh I see
>
> **Associate 2:**   Yea it's for next trip to the D
>
> **Unidentified:** Detroit who do she know out there

28.    On Associate 2's cell phone, I also found a photo depicting a large wooden crate with the top open and two large black duffel bags on the floor inside a closed garage.  The crate was similar in size, shape and construction to those depicted in photos I found on cell phones belonging to MINKS.  In text messages recovered from MINKS' cell phones, MINKS said this type of crate would be used to ship marijuana.

> viii.    **On November 17, 2021, Moody-Minks Associate 2 was arrested in Texas with a crate containing 106 pounds of marijuana.**

29.    On November 17, 2021, law enforcement received a complaint regarding suspicious activity near a residence in Grand Prairie, Texas (hereinafter, the "Grand Prairie residence").  The complainant reported that on more than one occasion, he or she observed a U-Haul truck deliver a large crate, which subsequently was taken into the residence's garage.  The complainant also reported that during these episodes, loud banging was heard near the residence.  Subsequently, another large box truck would pick up a crate.

30.    In response to the complaint's information, law enforcement conducted surveillance at the Grand Prairie residence and observed a Home Depot rental pickup truck in the driveway.  There was a large crate in the bed of the truck.  A short time later, a white box truck arrived.  Law enforcement observed Associate 2 walking from near the front door of the residence and meeting with the driver of the box truck.  The two appeared to be viewing a cell phone.  Next, Associate 2 backed the Home Depot

---

belonged to Associate 2.   For example, the device contains screenshots of bank transaction and package delivery records that include Associate 2's true name.  The device also contains selfie-style photos depicting Associate 2.

rental truck up to the back of the box truck.  A crate was then loaded into the white box truck and both vehicles departed.

31.     Law enforcement officers subsequently stopped both trucks.  Associate 2 said she had just left her Airbnb and planned to fly back to California that evening.  The driver of the box truck said he worked for the company Forward Air Inc.  He explained that he had a work order to pick up a box of antique furniture.  Law enforcement reviewed the work order which directed the driver to pick up antique furniture from Grand Prairie residence and listed a delivery address in Lithia Springs, Georgia.  The name on the delivery order was Victim M.S.[3]

32.     The driver of the box truck consented to a search of the back of the truck.  Law enforcement used a canine to inspect the truck.  The canine alerted on the truck's rear lift gate.  Law enforcement opened the crate in the back of the truck and found four large duffel bags.  The bags contained heat sealed packages of a green leafy substance later tested and confirmed to be approximately 106 pounds of marijuana.

33.     Law enforcement arrested Associate 2.  At the time of her arrest, Associate 2 possessed $1,859 in cash.  Pursuant to a state search warrant, law enforcement officers subsequently searched the Grand Prairie residence.  During the search, officers found:  a debit card bearing Associate 2's name; a California driver's license bearing Victim M.S.'s name and a photo of Associate 2; a social security card bearing Victim M.S.'s name and social security number.

B.     **Count Two: False Personation of an Officer or Employee of the United States, in violation of 18 U.S.C. § 912 [MINKS].**

34.     In April 2020, MINKS posed as federal law enforcement officials in order to obtain sensitive, confidential information regarding an April 13, 2020, shooting on Interstate 880 in Oakland, California (the "Interstate 880 shooting").

---

[3] On December 9, 2021, pursuant to a federal search warrant, FBI agents searched Jessica TANG's residence, which was located at 2532 Ronald McNair Way in Sacramento, California.  At the residence, law enforcement officers found handwritten notes that contained information such as names, social security numbers, birth dates, email addresses, passwords, security questions and answers, EDD claim numbers, and physical addresses for more than thirty unique identities.  Among that personal identifying information, agents found Victim M.S.'s name and social security number.

      i.    **Victims 1 and 2 were shot while driving on Interstate 880 in Oakland.**

35.     On April 13, 2020, at approximately 3:00 p.m., Victim 1 was driving a Honda Accord northbound on Interstate 880 near 23rd Avenue in Oakland.  Victim 2 was seated in the front passenger seat of the car.  While Victims 1 and 2 were traveling on Interstate 880, the occupants of another car, a white Jeep Cherokee, fired several .45 caliber rounds into Victim 1's Honda, striking Victims 1 and 2, and causing the car to crash into a wall beside the freeway.

36.     Shortly after the shooting, a CHP officer arrived on the scene.  The officer observed a woman ("Witness 1") near Victims 1 and 2.  Witness 1 indicated that she had stopped to help the victims.  Witness 1 indicated that Victim 2 had removed two suitcases from the Honda and placed them in her vehicle.  Victim 2 told Witness 1 that there was $400,000 in cash in the suitcases.  Victim 2 said he would give Witness 1 $10,000 to take the money to a person who Victim 2 identified.  Victim 2 collapsed while loading the suitcases into Witness 1's car.  Witness 1 removed the suitcases before law enforcement arrived.

37.     When CHP officers arrived at the scene of the shooting, the suitcases were on the shoulder of the freeway.  Victim 2 was seated in the trunk of the Honda and Victim 1 was laying on the ground near the Honda.  Victim 2 then walked about 25 feet away from the vehicle, where he collapsed.  CHP officers began rendering aid to Victim 2.  While rendering aid, a CHP officer noticed a black Glock semi-automatic handgun near Victim 2.

38.     While examining the Honda in which Victims 1 and 2 were traveling, CHP officers observed approximately 40 bullet holes, blood, and numerous .45 caliber shell casings.  The bullet holes in the vehicle and the presence of shell casings inside the vehicle indicated that the occupants of the white Jeep Cherokee and the occupants of Victim 1's vehicle had exchanged gunfire.

      ii.    **MINKS posed as a DEA agent and requested non-public information from a CHP investigator during three telephone calls.**

39.     On April 13, 2020, shortly after the Interstate 880 shooting, CHP officers and detectives continued their investigation at the Highland Hospital in Oakland.  While at the hospital, a CHP officer received a call from a woman who identified herself as DEA Special Agent Amanda Wilkins.  The officer quickly handed the phone to a CHP Investigator (hereinafter, the "CHP Investigator").

40.     With the CHP Investigator on the phone, the female caller again identified herself as DEA Special Agent Amanda Wilkins.  She then asked if Victim 2 was involved in the Interstate 880 shooting, identifying Victim 2 by his true name.  The female caller told the CHP Investigator that he would find about $350,000 in Victim 2's vehicle.  CHP officers had not yet obtained a warrant to search the Honda Accord in which Victims 1 and 2 were traveling, so CHP Investigator asked the female caller where she learned this information.[4]  The female caller provided a vague response and attempted to redirect the conversation.  The CHP Investigator asked the female caller for her telephone number so he could contact her after he spoke to the victims.  The female caller provided the following contact number:  (415) 942-1102 (hereinafter, "Ext. 1102").

41.     On April 13, 2020, at approximately 5:47 p.m., three hours after the first call with purported DEA Special Agent Amanda Wilkins, the CHP Investigator called Ext.1102.  A female voice answered.  The voice sounded like it belonged to the person who had identified herself as DEA Special Agent Amanda Wilkins in the first impersonation call.  This time, the female voice again identified herself as Amanda Wilkins.  During this call, purported DEA Special Agent Amanda Wilkins told the CHP Investigator that Victim 2 had recently flown to Oakland International Airport on JSX Airlines, a fact that had not been disclosed to the public.

42.     On April 13, 2020, at approximately 9:15 p.m., the CHP Investigator participated in a third call with purported DEA Special Agent Amanda Wilkins, who was again using Ext. 1102.  During this call, the female caller identified Victim 2's family members and various acts of violence targeting those members during the previous two years.  The female caller also told the CHP Investigator that Victim 2 and his family were marijuana traffickers who travelled from Oakland to Atlanta.  During the call, purported DEA Special Agent Amanda Wilkins asked CHP Investigator for information regarding

---

[4] On April 14, 2020, an Alameda County Superior Court Judge signed a warrant authorizing the search of the Honda Accord in which Victims 1 and 2 were traveling and its contents.  CHP officers removed the two suitcases from the trunk of the vehicle.  The officers used a drug-detecting canine to examine the Honda.  The canine alerted to the presence of drugs on one of the suitcases.  When the officers opened the first suitcase, they found $210,390 in cash.  In the other suitcase, they found an additional $163,880 in cash.  The cash was organized by denomination and rubber-banded together in units of $100 bills and packed with scented dryer sheets.  Based on my training and experience, I know that currency organized in this fashion along with odor-masking agents like dryer sheets is indicative of marijuana trafficking.

the search of the Honda Accord and whether the driver, Victim 1, had made any statements to law enforcement.

        iii.     **MINKS used a Pinger account to pose as a DEA agent and seek non-public information from a CHP investigator.**

43.     Pinger is a voice over Internet Protocol (VoIP) service that enables a user to make voice calls over Internet Protocol (IP) networks, such as the Internet.  In this investigation, agents obtained Pinger records that indicate that the telephone number used to contact the CHP Investigator was then-using the following IP address:  107.202.46.60.  According to AT&T U-verse records, the aforementioned IP address was assigned to "Dennise Mata" at 2260 Abbeyhill Road in Lincoln, California (i.e., the Abbeyhill residence).  This is the residence where Placer County law enforcement found MINKS in 2019.  In addition, Dennis Mata, also known as Dennis Mato, is a known associate of MINKS.  On June 14, 2021, I observed MINKS meeting with Mata.  Moreover, on or about March 19, 2019, MINKS told a Placer County Sheriff's Office detective that Mata was one of her partners in a marijuana business conducted under the name Exclusive Consulting LLC.

44.     Following the impersonation calls, DEA personnel confirmed that during the relevant time period, there was no DEA Special Agent named Amanda Wilkins.  In addition, following the impersonation calls, the CHP Investigator reviewed a known audio recording of MINKS.  After reviewing those recordings, the CHP Investigator confirmed that MINKS' voice matched the voice of the person who purported to be DEA Special Agent Amanda Wilkins.

        iv.     **Victim 2 died from a gunshot would inflicted during the shooting.**

45.     On April 26, 2020, Victim 2 died from the gunshot wounds he sustained during the Interstate 880 shooting.

**C.**     **Count Three: False Personation of an Officer or Employee of the United States, in violation of 18 U.S.C. § 912 [MINKS].**

        i.     **MINKS posed as an Assistant U.S. Attorney and sought non-public information from an Assistant U.S. Attorney for the Northern District of Georgia.**

46.     On April 27, 2020, a female-sounding caller contacted an Assistant U.S. Attorney for the Northern District of Georgia (hereinafter, "Victim AUSA").  Victim AUSA reported that the call was

from a blocked telephone number.  The female-sounding caller identified herself as Assistant U.S. Attorney Cynthia Lee from the U.S. Attorney's Office in San Francisco, California (hereinafter, "purported AUSA Lee").  Purported AUSA Lee asked if the Victim AUSA was the prosecutor assigned to a criminal case involving Associate 1 in the Northern District of Georgia.  Victim AUSA confirmed that he was assigned to Associate 1's case and that he was leading an ongoing investigation regarding MOODY.  Purported AUSA Lee asked Victim AUSA to confirm the identity of the investigation's lead federal agent.  During the call, Victim AUSA searched an internal directory for purported AUSA Lee. Victim AUSA did not find purported AUSA Lee listed in a Department of Justice internal directory. Victim AUSA then told purported AUSA Lee that he could not find a Cynthia Lee from the Northern District of California.  At that point, purported AUSA Lee immediately hung up.

47.     On or about May 14, 2020, Victim AUSA listened to a known audio recording of MINKS.  He confirmed that the voice he heard on the recording was consistent with the caller who claimed to be AUSA Cynthia Lee.

48.     Verizon Wireless call detail records for telephone number (206) 892-8334 (hereinafter, "Ext. 8334") show an outbound call to Victim AUSA at the approximate time of the call from purported AUSA Lee: April 27, 2020, at approximately 8:14 a.m. (Pacific Time).  The records for Ext. 8334 also indicate that the cell phone device assigned that number was an Apple iPhone 6 (hereinafter, the "iPhone 6").  The records also indicate that the iPhone 6 was purchased on or about March 2, 2020, at a Walmart store in Roseville, California.

49.     Apple Inc. records related to the iPhone 6 indicate that the phone was registered to "Jane Dough" using IP address 98.208.88.211.  Comcast Corporation records indicate that during the relevant time period, the subscriber associated with IP address 98.208.88.211 was "Dennise Prather" at 5113 Glenwood Springs Way in Roseville, California (hereinafter, the "Glenwood Springs residence").  On June 22, 2021, after providing *Miranda* warnings, I interviewed MINKS at the Glenwood Springs residence.  At the time, MINKS was living at that property.  MINKS stated that she moved into the Glenwood Springs residence approximately one year earlier.

///

///

**D.   MINKS impersonated federal law enforcement officials on additional occasions and using additional identities.**

    i.    **MINKS posed as purported AUSA Lee to try to obtain information from the Alameda County District Attorney's Office.**

50.   During the course of this investigation, I learned that purported AUSA Lee also contacted two prosecutors from the Alameda County District Attorney's Office.  Deputy District Attorney 1 reported that on or about April 9, 2020, he received a call from a woman who identified herself as Assistant U.S. Attorney Cynthia Lee from the U.S. Attorney's Office in San Francisco.  During the call, purported AUSA Lee inquired about Victim 2—the victim who died from the injuries he sustained during the Interstate 880 shooting.  The call detail records for Ext. 8334 show outbound calls to Deputy District Attorney 1's telephone number on April 8, 2020, and April 9, 2020.

51.   On April 15, 2020, purported AUSA Lee also called Deputy District Attorney 2.  During that call, purported AUSA Lee again inquired about Victim 2.  Call detail records for Ext. 8334 show an outbound call to the Alameda County District Attorney's Office on April 15, 2020.

    ii.    **MINKS impersonated an FBI Special Agent to disrupt a Placer County real estate transaction.**

    a.    The Real Estate Contract

52.   On or about July 17, 2020, Buyer 1 and Buyer 2, a married couple, entered a contract to purchase the real property located at 9211 Rock Springs Road in Newcastle, California (hereinafter, the "9211 Rock Springs property").  The seller of the property listed on the sale contract was Seller 1.  The purchase price was $1,650,000.

53.   On or about July 18, 2020, Buyer 1 and 2's real estate agent (hereinafter, "Buyers' Real Estate Agent") received a communication from the sellers' real estate agent (hereinafter, "Sellers' Real Estate Agent"), indicating that Sellers 1 and 2 wanted to cancel the sale contract.  Sellers' Real Estate Agent indicated that Sellers 1 and 2 wanted to cancel the contract because there was a missing signature on the original purchase contract.  The purchase agreement was not cancelled at that time; it was cancelled at a later date after MINKS posed as an FBI Special Agent to dissuade Buyers 1 and 2 from purchasing the property.

///

b.   MINKS posed as an FBI agent during a call with the Buyers' Real Estate Agent.

54.     On or about July 24, 2020, Buyers' Real Estate Agent received a telephone call from a blocked phone number.  The voice of the caller was described as a female voice.  The caller identified herself as FBI Special Agent Amanda Sanchez Greenz, and provided a badge number (hereinafter, "purported FBI Agent Greenz").  Purported FBI Agent Greenz said she was assigned to the San Francisco and Sacramento FBI field offices.

55.     During the July 24 call with Buyers' Real Estate Agent, purported FBI Agent Greenz said she was notified that Buyers 1 and 2 had made a recent deposit into the escrow account associated with the purchase of 9211 Rock Springs property.  Purported FBI Agent Greenz warned Buyers' Real Estate Agent that Seller 1 was under investigation by the FBI for "illicit gains" and what she described as tax "invasion."  Purported FBI Agent Greenz indicated that Seller 1 had a history of buying and selling property without paying taxes and recently changed the entity listed on the title for 9211 Rock Springs Road to a family trust.[5]  Purported FBI Agent Greenz said that if Buyers 1 and 2 purchased the 9211 Rock Springs property, the property would be seized.  Purported FBI Agent Greenz also said that another buyer had deposited funds into Sellers 1 and 2's account.  When asked about the identity of the other buyer, purported FBI Agent Greenz said the new buyer was a marijuana cultivator who was licensed and "above board."

56.     Buyers' Real Estate Agent questioned purported FBI Agent Greenz about her identity. Purported FBI Agent Greenz responded by calling Buyers' Real Estate Agent on a separate telephone line that was assigned a 415 area code.  Purported FBI Agent Greenz claimed that the 415 number was an alternate office number.  Purported FBI Agent Greenz also told Buyers' Real Estate Agent that impersonating an FBI agent was a federal offense.

57.     During the July 24 call with purported FBI Agent Greenz, Buyers' Real Estate Agent

---

[5] On or about July 20, 2020, Buyers 1 and 2 became aware that the Sellers 1 and 2, wanted to change the title for the 9211 Rock Springs property.  Title was held by the family trust.  Sellers 1 and 2 sought to remove the family trust and list Seller 2 as the sole owner.  Seller 1 told Buyer 1 that Sellers 1 and 2 were working with an attorney to change the title through a different title company that was not involved in the sale transaction.  Seller 1 discussed a desire to delay the sale of the 9211 Rock Springs property until December 2020.

added Buyer 1 to the call.  When Buyer 1 joined the call, purported FBI Agent Greenz reiterated much of what she had told Buyers' Real Estate Agent.  Purported FBI Agent Greenz told Buyer 1 that she knew he had young children and a family.  She said she was letting him know about all of this because she was not the "typical asshole agent."  Buyer 1 asked purported FBI Agent Greenz why she had waited so long to disclose the existence of the investigation.  Purported FBI Agent Greenz said we— referring to the FBI—only get notified once escrow is opened.  Purported FBI Agent Greenz said she had done surveillance of the 9211 Rock Springs property.  Buyer 1 expressed concern because the home he currently owned was already under contact to be sold.  Purported FBI Agent Greenz said the FBI would help cancel the sale of his home.  Purported FBI Agent Greenz told Buyer 1 to cancel the purchase of the 9211 Rock Springs Road property, not to tell Sellers 1 and 2 about the investigation, and instructed him not to get involved in the investigation.

<b>c.</b>   <u>Amanda Sanchez Greenz was not an FBI agent.</u>

58.     As part of this investigation, I reviewed records to determine whether there was an FBI Special Agent named Amanda Sanchez Greenz.  I found no records indicating that there was a person named Amanda Sanchez Greenz who served as an FBI Special Agent.

<b>d.</b>   <u>Buyer 1 received text messages from (202) 809-7438.</u>

59.     On or about July 24, 2020, following the telephone call involving purported FBI agent Greenz and Buyers' Real Estate Agent, Buyer 1 received text messages from (202) 809-7438 (hereinafter "Ext. 7438").  Set forth below are the text messages from Ext. 7438:

**Ext. 7438:** This is Special Agent Amanda Sanchez Greenz.  I am providing you with my direct contact information should anything come up with the property previously discussed.  Again, on behalf of myself and this pending investigation, we are truly sorry that you were affected.  I will have been trying to talk to my colleagues on how to handle this situation with respect with your current home sale.  I will follow up with your agent within the next hour.  I have to speak to a supervisor with respect to this.  I will do everything in my power to assist you.

**Buyer 1:** Thank you Ms. Greenz.  Do you have the contact info for the IRS Agent in charge who is pursuing the tax invasion matter?

**Ext. 7438:** Tax invasion isn't handling by an IRS agent.  Criminal matters are handled with the United States Attorneys office.  An IRS

1    agent is only involved with auditing matters.  I reached out to
2    your realtor.  No response.

**Buyer 1:**   Ok so only the USAO handles tax invasion matters?  Just
3    curious to know how much trouble he's in.  Sounds like deep
4    doo doo

**Ext. 7438:**   [an attached image with the following text visible] to evade or
5    defeat tax U.S. Code Any person who willfully attempts in
     any manner to evade or defeat any tax imposed by this title or
6    the payment thereof shall, in addition to other penalties,
     provided by law, be guilty of a felony and, upon conviction
7    thereof, shall be fined no more than $100,000 ($500,000 in the
     case of a corporation), or imprisoned not more than 5 years, or
8    both

9    **Buyer 1:**   I thought it was tax "invasion" or is it tax evasion?

10   **Ext. 7438:**   The USAO office handles criminal matters.  Some tax matters
     are handled, depending on matter by the irs.  All tax issues are
11   not criminal.  It is tax evasion.

12   **Buyer 1:**   So what should I do?  I'm so nervous

13   **Ext. 7438:**   I'm quite confused.  I can not legally advise you.  I am not an
     Attorney.  If you want to seek representation you can do so
14   but this matter doesn't effect you.  In the sense of an
     investigation.  Your realtor has not responded.  I indicated I
15   would assist you as much as possible in informing the
     representatives on your end the legal circumstances
16   surrounding the matters.  Whatever other concerns you have
     please seek counsel if you are concerned about personal
17   issues.  You are not being investigated at this point.

18   **Buyer 1:**   I thought you advised me to notify the Sellers that I could not
     secure funding and to try and cancel the agreement that way?
19   Great…now we're both confused!  Maybe we should both get
     on the phone with the USAO?

20
     **Ext. 7438:**   Sir, What you have been advised was just that.  18 U.S.C. §
21   1503 defines "obstruction of justice" as an act that "corruptly
     or by threats of force, or by any threatening letter or
22   communication, influences, obstructs, or impedes, or
     endeavors to influence, obstruct or impede, the due
23   administration of justice."  [Search results snippet from the
     Internet: Whoever willfully endeavors by means of bribery to
24   obstruct, delay or prevent the communication of information
     relating to a violation of any criminal statue of the United
25   States by any person to a criminal investigator shall be fined
     under this title, or imprisoned not more than five years, or
26   both.]  If you want to discuss with an attorney you are more
     than welcome to do that.  The risk is yours to take.  It was
27   ethical and morally right to keep you informed.

28

1        e.      Buyers' Real Estate Agent received a text message from Ext. 7438

2    60.     On or about July 24, 2020, after the phone call described above, Buyers' Real Estate

3    Agent received the following text message from Ext. 7438:

4            [Buyers' Real Estate Agent], This is SA Amanda Greenz, I am providing
             you my direct contact information should you need it for any purposes.
5            Again, truly sorry to you and your clients were affected by this. Update; I
             am following up with the realtors involved on the sale of his property to
6            see what can be done.  Be well. Take care

7        f.      Additional communications with Sellers 1 and 2.

8    61.     On or about July 24, 2020, Buyer 1 called Seller 1 to inform him of the call he received

9    from purported FBI Agent Greenz.  Seller 1 said he did not know anything about the investigation.

10   Seller 1 said purported FBI agent Greenz could have been anyone and that there are a lot of crazy people

11   out there.  Buyer 1 asked Seller 1 if he was concerned about someone showing up to the 9211 Rock

12   Springs Road property.  Seller 1 responded that he was not concerned and said, "I have plenty of guns."

13   Buyer 1 asked Seller about the other buyer that purported FBI Agent Greenz mentioned.  Seller 1 said

14   there was an interested buyer who ran a marijuana dispensary and who claimed to have the ability to

15   make an all-cash offer.  However, that offer never materialized and he had not heard from that buyer in

16   weeks.

17       g.      Seller 1 indicated that he would not sell if the sale was subject to IRS
                 liens.
18

19   62.     On or about July 31, 2020, Buyers' Real Estate Agent was present at the 9211 Rock

20   Springs Road property while a home inspection was being completed.  Seller 1 was also present.  Seller

21   1 told Buyers' Real Estate Agent that he was previously forced out of a house he owned as a result of

22   foreclosure.  Seller 1 stated that that property was located in Clear Lake, California and the property was

23   valued at more than $1,000,000.  Seller 1 also told Buyers' Real Estate Agent that he destroyed that

24   house before he left and the bank sold the house for less than $200,000.  Seller 1 went on to describe

25   financial trouble he had experienced beginning around 2010.  Seller 1 said that if he had to pay his tax

26   liens, he may as well not sell the 9211 Rock Springs Road property.  Seller 1 said he would not leave the

27   house and would not be forced out without making a problem.  He also said he would do anything in his

28   power not to let the transaction close.

h.      Seller 1 told Buyer 1 that Seller 1 was subject to $200,000 tax lien.

63.     On or about August 13, 2020, Buyer 1 spoke with Seller 1 on the telephone.  Seller 1 told Buyer 1 that they needed to cancel the current purchase agreement.  Seller 1 said they needed a new agreement so they could change the title.  Seller 1 went on to say that he had been through bankruptcy a few times but that the most recent bankruptcy had been resolved in March of 2020.  Seller 1 said he owed about $200,000 in taxes which had all been paid to the IRS, but had not been recorded yet.  Buyer 1 responded to Seller 1 and said there was no reason to cancel the agreement.  Buyer 1 told Seller 1 that if the tax payment had been made, things would get sorted out with the IRS.

64.     On or about August 13, 2020, a few minutes after Buyer 1 spoke with Seller 1, Seller 2 called Buyer 2 and provided information similar to the information that Seller 1 shared with Buyer 1, which is described in the preceding paragraph.

i.      Buyer 1 attempted to contact purported FBI Agent Greenz.

65.     On or about August 13, 2020, and August 14, 2020, Buyer 1 attempted to contact purported FBI Agent Greenz by calling and text messaging Ext. 7438.  Buyer 1 was able to send text messages to Ext. 7438, but Buyer 1 believed Ext. 7438 may not have been in service at the time.  Buyer 1 did not receive a response from purported FBI Agent Greenz.

j.      Telephone call from purported San Diego Division FBI agent.

66.     On or about August 14, 2020, Buyers 1 and 2 received a telephone call from telephone number (760) 929-0811 (hereinafter "Ext. 0811").  Ext. 0811 is assigned to an FBI office in Carlsbad, California.  Buyers 1 and 2 indicated that they believed the voice sounded like it belonged to a man.  The caller identified himself as David Gonzalez or David Guttierez, (hereafter "David").  David claimed to be a Special Agent in the Carlsbad FBI field office.  David refused to provide a badge number.  David said he could meet Buyer 1 at the FBI office in Carlsbad.  Buyer 1 said he was in Lake Havasu and asked David if the FBI had an office there.  David said the FBI did not have an office in Lake Havasu.  Buyer 1 told David he knew he was not really an FBI agent because there was an FBI office in Lake Havasu.

67.     Buyer 1 then called the FBI office in Carlsbad.  He did this using another phone.  When Buyer 1 was connected with the FBI office in Carlsbad, he asked if David was a Special Agent in that

1  office.  The receptionist at the Carlsbad FBI office said David was not a Special Agent.  Buyer 1 then

2  put his two phones together and the FBI receptionist told David to stop harassing the Buyers 1 and 2.

3        68.    After Buyer 1 ended the call with the FBI's Carlsbad office, Buyer 1 again told David

4  that he knew he was fake and asked him who he was and what he wanted.  David responded, "You'll

5  find out."

6                  k.    <u>The cell phone assigned Ext. 7438 was purchased at a Walmart near</u>

7                          <u>MINKS' Roseville, California home.</u>

8        69.    I reviewed records received from TracFone.  TracFone is a mobile virtual network

9  operator (MVNO) that partners with large cell phone service providers or carriers like Verizon Wireless.

10  The records from TracFone included subscriber information for Ext. 7438, which purported FBI agent

11  Greenz used to communicate with Buyer 1 and Buyer 1 and 2's real estate agent.  Verizon was identified

12  as the cell phone service provider or carrier.  The phone service was activated on May 19, 2020, and had

13  an end date of September 22, 2020.

14        70.    The TracFone records indicate that the device to which Ext. 7438 was assigned had a

15  device serial number, also known as the IMEI, of 354916095765250 (hereinafter, the "Greenz

16  impersonation phone").[6]  No customer name is listed on the account.  The customer city is listed as

17  Sacramento, the email address is listed as wildcard@yahoo.com, and phone and address were both listed

18  as 1378288977.  An open-source search of telephone number 1378288977 failed to identify any

19  subscriber records.

20        71.    The TracFone records also include information regarding where the Greenz

21  impersonation phone was purchased.  The device was purchased at a Walmart in Roseville, California.

22                  l.    <u>Walmart records indicate that the Greenz impersonation phone is an Apple</u>

23                          <u>iPhone 7.</u>

24        72.    I reviewed purchase records from Walmart, a retail supermarket chain, in Roseville,

25  California.  The records are consistent with the TracFone purchase records described above.  The

26  Walmart records indicate that the Greenz impersonation phone was an Apple iPhone 7.  The Walmart

27  _____

28      [6] As set forth in more detail below, the cell phone which is assigned IMEI 354916095765250, is a device that has been assigned many different telephone numbers during the relevant time period.

records indicate that the Greenz impersonation phone was purchased with cash on May 19, 2020, at approximately 3:52 p.m.  The purchase was made at the Walmart store located at 900 Pleasant Grove Boulevard in Roseville, California.

m.   Apple and Comcast records for the Greenz impersonation phone link it to MINKS.

73.   Apple Inc. provided records regarding the Greenz impersonation phone.  Apple iTunes subscriber data for the Greenz impersonation phone include an email address of janedoughho@icloud.com.  The email address is associated with two names and addresses.  The first name is "What Dafuck" at 1000 Whillshire Blvd, Beverly Hills, California.  The second name is "Myra M" at 747 Eagle Ave, Alameda, California.  The Apple records also include the following data regarding the Greenz impersonation phone:

- Between the dates July 11, 2020, and August 17, 2020, iTunes updates for the device were made in the name of "Myra M" with address 747 Eagle Ave, Alameda, California.
- Between the dates July 13, 2020, and July 29, 2020, iTunes transactions were made in the name of "Myra M" with address 747 Eagle Ave, Alameda, California.
- Between the dates May 19, 2020, and August 17, 2020, the Greenz impersonation phone made connections to Apple iTunes from IP address 98.208.88.211.  Further investigation revealed that this IP address was assigned to the Internet service provider Comcast.  An open-source search revealed that 747 Eagle Ave, Alameda, California is as an address that is linked to MINKS.

74.   Comcast provided subscriber information for the account associated with IP address 98.208.88.211.  The physical address for service was 5113 Glenwood Springs Way in Roseville, California (i.e., the Glenwood Springs residence).  The subscriber name was Dennise Prather and the service was active between May 2020 and October 2020, when FBI received the Comcast records.

///

n.    <u>Utility records for the Glenwood Springs residence and DMV records link MINKS's associate TANG to the property.</u>

75.    I reviewed electric, water and solid waste service/utility records for the Glenwood Springs residence.  The records indicate that Jessica TANG has been the property resident since July 1, 2020.  However, the records list a mailing address of 2173 Viola Way, Roseville, California.

76.    I reviewed California Department of Motor Vehicles ("DMV") registered vehicle records for TANG.  Through a review of those records, I identified a record indicating that there was a vehicle that is listed as registered to Jessica TANG or Myra MINKS at 2532 Ronald McNair Way in Sacramento, California.  The registration for that vehicle was valid from June 30, 2020, to June 30, 2022.

o.    <u>Placer County Probation Department location data links MINKS to the Greenz impersonation phone, the Glenwood Springs residence, and  9211 Rock Springs Road property.</u>

77.    In October 2020, I reviewed location data from an ankle monitor that a Placer County Superior Court Judge ordered MINKS to wear.  The Placer County Probation Department provided the data.  The location data reveals that on May 19, 2020, MINKS was at or near the Walmart store located at 900 Pleasant Grove Avenue in Roseville, California from approximately 3:06 p.m. to 3:59 p.m.  As described above, the Greenz impersonation phone was purchased at that Walmart store on May 19, 2020, at 3:52 p.m.

78.    Placer County location data also indicates that between approximately May 6, 2020, and February 7, 2021, MINKS was frequently present at the Glenwood Springs residence, with a pattern of overnight stays.  On October 16, 2020, I observed MINKS drive a gray Range Rover with California license plate 8HKR537 out of the garage at Glenwood Springs residence.

79.    Placer County location data also indicates that MINKS was at 9211 Rock Springs Road, Newcastle, California—Sellers 1 and 2's property—on June 29, 2020; June 30, 2020; July 1, 2020; July 14, 2020; and September 28, 2020.  Moreover, Sellers 1 and 2's real estate agent provided FBI with a COVID-protocol sign-in form containing MOODY's name and signature, indicating that MOODY visited the Seller 1 and 2's property while it was on the market.

///

iii.    **MINKS  also posed as U.S. Secret Service Agent Michelle Smith.**

80.    On or about October 14, 2020, the Colma Police Department received and recorded calls from a woman using telephone number (203) 350-7600 (hereinafter, "Ext. 7600").  The woman identified herself as Michelle Smith and claimed to be affiliated with "Adult Probation in Redwood City" and the U.S. Secret Service in Washington, D.C. (hereinafter, "purported Secret Service Agent Smith").  Purported Secret Service Agent Smith inquired about the location a Jeep that had been seized. She said the Secret Service was conducting a separate investigation and trying to locate the vehicle. After being told that the vehicle was in the evidence lockup at the Colma Police Department, purported Secret Service Agent Smith asked how long the vehicle would be there.  After being told that an ATF agent was processing the asset forfeiture paperwork for the vehicle, purported Secret Service Agent Smith asked for the ATF agent's name.  A Colma Police Department official told her she would need to provide her agency's identifier, which is also known as an originating agency identifier ("ORI").  She then provided an invalid ORI.

81.    According to a Colma Police Department official, the Jeep about which purported Secret Service Agent Smith inquired was seized following a probation search and subsequent arrest of Person 5 on or about July 16, 2020.  During that probation search of the Jeep, law enforcement found a Sig Sauer 9 mm handgun in a hidden compartment.  The gun was loaded with 10 rounds.  In the Jeep, law enforcement also found temporary California driver's license bearing the name of Moody-Minks Associate 3.[7]  The Jeep's registered owner told Colma police that Associate 3 is her cousin.  The registered owner claimed that she did not give Associate 3 keys to the Jeep, stating she did not want to get more people put in jail.

82.    A Colma police officer subsequently contacted an official at the U.S. Secret Service and confirmed the Secret Service did not have an agent or employee named Michelle Smith.

---

[7] On June 22, 2021, Roseville Police attempted to stop MOODY's vehicle.  After a Roseville patrol officer activated the car's emergency lights, MOODY failed to stop as directed.  Instead, MOODY evaded police.  During the police pursuit, MOODY stopped his car so that Associate 3 could exit the vehicle and flee on foot.  Ultimately, Roseville Police stopped MOODY and Associate 3 several minutes later.  While detained, an FBI agent seized a cell phone from Associate 3.  Pursuant to a federal search warrant, agents reviewed Associate 3's cell phone and found photos of Associate 3, a felon, shooting an assault rifle at an Atlanta area gun range.

83.     I listened to the recorded calls described above.  Prior to reviewing the recordings, I had listened to other known recordings of MINKS.  In addition, on June 22, 2021, I met with MINKS in-person and participated in a conversation with her for nearly an hour.  Based on those experiences, I am familiar with MINKS' voice, and I believe the voice of the person claiming to be Smith belongs to MINKS.

84.     I reviewed records from the company Twilio that are associated with Ext. 7600.  Twilio is a company based in San Francisco, California, which provides programmable communication tools for making and receiving phone calls, sending and receiving text messages, and performing other communication functions over the Internet.  Twilio records indicate that during the relevant time period, Ext. 7600 was being used by a company and customer of Twilio called Appsverse.  Appsverse is a Santa Clara, California-based company that provides communication tools for making and receiving phone calls to include voicemail and sending and receiving text messages.

85.     I also reviewed Appverse records for Ext. 7600, which indicate the account was created on July 14, 2020, with username knowhowtogetpaid@icloud.com.  The records show a login on April 6, 2021, from IP address 98.208.88.211.  Records provided by internet service provider Comcast indicate that IP address 98.208.88.211 was then-assigned to MINKS' residence in Roseville, California.

86.     Apple Inc. records for the account knowhowtogetpaid@icloud.com indicate that the account was linked to the Greenz impersonation phone, which MINKS used to impersonate an FBI Special Agent on or about July 24, 2020.  Pursuant to a federal search warrant, FBI agents found the Greenz impersonation phone at Jessica TANG's residence on December 9, 2021.  Thereafter, the Greenz impersonation phone was seized and assigned FBI evidence item number 1B70.

**E.     Count Four: Impersonator Making a Search, in violation of 18 U.S.C. § § 913 and 2 [MINKS and MOODY]**

87.     On or about May 17, 2021, Phone Company 1 received phone calls from a person identifying herself as a law enforcement officer named "Betty Yu" and "Betty Yi" (hereinafter, "purported Agent Yu").  Purported Agent Yu claimed to be from the federal government, specifically the United States District Court and the Department of Justice in the Western District of Virginia.  According to Phone Company 1, purported Agent Yu also provided a badge number.  Purported Agent

Yu stated that she had submitted a warrant for an urgent matter.

88.     Beginning on or about May 17, 2021, and over the course of several communications, Phone Company 1 received a copy of a purported federal search warrant application and search warrant, which appeared to require Phone Company 1 to disclose subscriber information, call detail records with cell tower information, and prospective location information for telephone number (510) 241-6404 (hereinafter, "Ext. 6404").[8]  The purported search warrant application and search warrant documents listed case number 4:19-mj-00028-RSB and contain purported signatures of a federal task force officer and United States Magistrate Judge.  The documents appear to have been authorized by a United States Magistrate Judge in United States District Court for the Western District of Virginia on May 17, 2021.

89.     I reviewed a true copy of the application and corresponding search warrant assigned case number 4:19-mj-00028-RSB, which were filed in the United States District Court for the Western District of Virginia.  I compared those documents to the purported application and warrant documents submitted by purported Agent Yu.  I noticed that the documents provided by purported Agent Yu did not match what had been authorized by the United States Magistrate Judge and filed in the Western District of Virginia.  There were several alterations, including, among other things, the property (i.e., the account) to be searched and the date.  In total, at least four altered versions of search warrant number 4:19-mj-00028-RSB were submitted to Phone Company 1.

90.     In addition to the altered and fake warrants seeking information regarding Ext. 6404, Phone Company 1 also received purported warrants seeking information regarding cell phone number (510) 241-6405 (hereinafter, "Ext. 6405"), (415) 583-5554 (hereinafter, "Ext. 5554"), and account number XXXXXXXX8853 (hereinafter, "Account No. 8853").

91.     In response to the fake warrant for Ext. 6405, Phone Company 1 provided subscriber information and historical call detail records that included cell tower information.  Additionally, prospective location information was provided from May 17, 2021, through May 31, 2021.

---

[8] Call detail records are data regarding incoming and outgoing calls and text messages associated with a particular cell phone account.  Call detail records can include cell tower location information, which identifies the location of the provider's cell tower through which the user's call or text message was transmitted.  This information can identify the user's physical location.  Additionally, prospective location information is data the service provided provides (pursuant to a search warrant or court order) that identifies the current location of the cell phone device that is subject to the warrant or order.

92. In response to the fake warrant for Ext. 5554, Phone Company 1 provided historical call detail records, including cell tower information, and prospective location information associated with that account from the time period May 23, 2021, through May 29, 2021.

93. I listened to recorded telephone calls between purported Agent Yu and Phone Company 1 personnel. Based on my familiarity with MINKS' voice, as described above, I believe the person pretending to be purported Agent Yu was MINKS.

94. On or about June 2, 2021, a man called Phone Company 1 at least three times and identified himself as San Francisco Gang Task Force Officer E.O (hereinafter, "purported TFO").[9] The purported TFO asked Phone Company 1 to authorize another purported law enforcement officer to receive the data the phone company was providing for Ext. 5554, pursuant to the previously submitted fake warrant. I listened to three telephone calls between the purported TFO and Phone Company 1. I believe the person pretending to be the purported TFO was MOODY. This belief is based on my previous review of a known recording of MOODY's voice and my own interaction with MOODY on June 22, 2021, during which I heard his voice.

95. Purported Agent Yu made some of the calls to Phone Company 1 from telephone number (424) 438-4744 (hereinafter, "Ext. 4744"). TracFone records for Ex. 4744 indicate that the phone was purchased at a Walmart store in Rocklin, California on March 17, 2021. The purchase receipt for the phone indicates that two Apple iPhone SE phones were purchased in the same transaction. The IMEI, or unique phone identifier, for each phone is listed on the Walmart receipt. The IMEI number on the second phone matched the IMEI number assigned to a phone FBI agents seized from MINKS on or about June 22, 2021, pursuant to a federal search warrant.[10]

96. Apple Inc. records indicate that the phone assigned Ext. 4744 and the other device purchased in the same transaction had used IP address 98.208.88.211. According to Comcast records, further described above, IP address 98.208.88.211 was then-assigned to MINKS' Glenwood Springs residence.

97. On June 22, 2021, FBI agents searched MINKS' Glenwood Springs residence pursuant to

---

[9] The caller used the name and assumed the identity of an actual law enforcement officer.

[10] This device was assigned FBI evidence item number 1B41.

a federal search warrant.  During the search, agents found a piece of paper towel containing handwritten notes.  The notes include telephone number (415) 583-5554, actual Task Force Officer E.O.'s name and email address, an email address beginning with Amanda.willits, and the name of the authorization/request form submitted to Phone Company 1.

98.  On June 22, 2021, I interviewed MINKS during the search of her vehicle and the Glenwood Springs residence.  At the beginning of the interview, I advised MINKS of her *Miranda* rights.  She acknowledged that she understood her rights and agreed to speak to me.  Thereafter, MINKS told me that she wrote the information contained on the paper towel described above.  MINKS indicated that she prepared the information for MOODY.  She stated that the information was used for tracking the physical location of Victim 3.  MINKS indicated that the "Amanda Willits" email address was where MOODY wanted the prospective location information regarding Victim 3's cell phone to be sent.  MINKS said that MOODY had a "beef," or ongoing dispute, with Victim 3.  According to MINKS, MOODY wanted MINKS to call the San Francisco Police Department, posing as another law enforcement officer, to find out why the San Francisco Police Department was also tracking Victim 3.

### i.  **Victim 3 was the target of a shooting at the Grand Hyatt SFO.**

99.  On May 3, 2021, there was a shooting at the Grand Hyatt Hotel located near the San Francisco International Airport.  According to witnesses and video surveillance footage, a white Acura RDX approached the front of the hotel, two people exited the vehicle and began shooting in the direction of people standing, and vehicles parked, in front of the hotel.  After the shooting, investigators found Victim 3's blood at the scene of the shooting.  Based on that fact, Victim 3 is believed to have been at least one of the targets of the shooting.

### ii.  **MINKS is linked to the rental car used by the shooters during the Grand Hyatt SFO shooting.**

100.  The Acura RDX that the gunman used during the shooting was rented using an online application called Getaround.  Moody-Minks Associate 4's name was listed on the Getaround account that was used to the rent the Acura RDX that was involved in the shooting.  When FBI agents searched MINKS on June 22, 2021, pursuant to a federal warrant, they found an EDD-linked debit card in the name of Associate 4 on MINKS' person.  During MINKS' post-*Miranda* interview on June 22, 2021,

1    MINKS told me that Associate 4 was her friend who lived in Dallas, Texas.

2        F.    **Count Five: Mail Fraud, in violation of 18 U.S.C. § § 1341 and 2 [MINKS and**
3              **TANG]**

4        101.    On or about August 21, 2020, an application for unemployment benefits was submitted to

5    EDD using Victim D.A. personal identifying information.  The personal identifying information

6    included D.A.'s name, date of birth, and social security number.  On or about August 23, 2020, after

7    EDD approved the application for benefits, a Bank of America, N.A. debit card was issued in the name

8    of Victim D.A.  Bank of America records indicate that the debit card was mailed to TANG's residence

9    in Sacramento, California.  According to EDD records, approximately $22,800 in unemployment benefit

10   funds were disbursed via the Bank of America debit card in August and September of 2020.

11       102.    On April 18, 2022, FBI agents spoke with Victim D.A. in Texas.  He told agents that he

12   never applied for EDD benefits.  Nor had he given anyone else permission to use his identity or to apply

13   for EDD benefits on his behalf.  Victim D.A. stated that he did not know TANG and was not familiar

14   with TANG's address.

15       103.    On December 9, 2021, pursuant to a federal search warrant, FBI agents searched TANG's

16   residence, which was located at 2532 Ronald McNair Way in Sacramento, California.  At the residence,

17   law enforcement officers found handwritten notes that contained information such as names, social

18   security numbers, birth dates, email addresses, passwords, security questions and answers, EDD claim

19   numbers, and physical addresses for more than thirty unique identities.  Based on my training and

20   experience, I know that individuals engaged in fraud and identity theft often keep records regarding the

21   stolen and false identities used to submit fraudulent claims for benefits.

22       104.    During the execution of the search warrant, I interviewed TANG.  Before the interview, I

23   advised TANG of her *Miranda* rights.  She acknowledged that she understood her rights and agreed to

24   talk to me.  TANG said that the EDD card, notes and other items found with the notes belonged to her

25   friend Myra MINKS.  TANG was shown a copy of records related to an EDD claim submitted in the

26   name K.T.  The records included an image of a U.S. passport card that was submitted with the claim.

27   TANG stated that she used the name K.T. as an alias many years ago, but denied ever seeing the

28   passport card bearing the name K.T.  TANG also said she had never submitted an EDD claim in the

name K.T.  However, I found an image of that same passport card while conducting a search of TANG's

cell phone, pursuant to a federal search warrant.  I then contacted U.S. Department of State personnel

who confirmed that the passport card was fraudulent.  The passport card number on TANG's fraudulent

K.T. passport card actually belonged to a real person residing in Ohio.

        i.      **MOODY and MINKS laundered the EDD fraud proceeds in Las Vegas.**

105.    On or about September 4, 2020, MOODY made a purchase at a Cartier store in Las

Vegas for $12,788.25.  That purchase was made with a Bank of America debit card in the name of

Victim D.A.

106.    On June 22, 2021, pursuant to a federal search warrant, FBI agents searched MINKS and

found and seized her Apple iPhone.  I reviewed text messages on that phone, including texts between

MOODY and MINKS that were sent and received before, during, and after the MOODY's Cartier

purchase.  MINKS sent MOODY a screen shot that depicted the recent transactions and balance on an

account in the name Victim J.M., another real person whose identity MINKS used to submit a fraudulent

EDD benefits application.  The balance was $16,036.72 with a pending purchase at "Bellagio—Front

Desk" for $13,665.88.[11]  According to the screen shot, the then-available balance in the account for

Victim J.M. was $2,370.84.  Victim J.M. is one of the identities listed in the handwritten notes that

agents found during the search of TANG's residence at 2532 Ronald McNair Way in Sacramento,

California, pursuant to a federal search warrant.  EDD records indicate that unemployment benefits were

paid to this identity.

107.    In the ensuing text conversation, MINKS assisted MOODY as he made the large-dollar-

value purchase at Cartier.  Set forth below are excerpts of text message between MINKS and MOODY

on September 4, 2020:

      **MOODY:**  They go ask for my Shit [identification] in Cartier?

      **MINKS:**    They should not no

      **MOODY:**  Ok

      **MINKS:**    They didn't ask for anything but in dumb ass LV

---

[11] The Bellagio is a hotel and casino in Las Vegas, Nevada.

| | | |
|---|---|---|
| 1 | **MINKS:** | Ask for Lacey. I called from Dallas and said you were a client |
| 2 | **MINKS:** | You got the pin. If it declines I just gotta call and get it unblocked |
| 3 | | |
| | **MOODY:** | Addy make it? I'm in Cartier |
| 4 | | |
| | **MINKS:** | Say debit. If they ask did you ask for Lacey |
| 5 | | |
| 6 | **MOODY:** | Decline |
| | **MINKS:** | Calling right now. Hold on. Tell her you are traveling |
| 7 | | |
| | **MINKS:** | But dom is about to come. What's the total |
| 8 | | |
| 9 | **MOODY:** | 12.7 |
| | **MINKS:** | Clearing now. Hold on |
| 10 | | |
| | **MINKS:** | CLEARED. $17,057.30 |
| 11 | | |
| 12 | **MINKS:** | What did you buy me |
| | **MOODY:** | We went in Tom |
| 13 | | |
| | **MINKS:** | I was talking about CARTIER |
| 14 | | |
| 15 | **MOODY:** | I'm ready now I got me feet Wett |
| | **MOODY:** | I was looking at those watches |
| 16 | | |
| | **MINKS:** | Lmao |
| 17 | | |
| 18 | **MINKS:** | Did it work |
| | **MINKS:** | I got like 15 more |
| 19 | | |

108.   I reviewed records from Richemont, which is the parent company of Cartier, a luxury jewelry and watch-making company headquartered in France.  The records included a receipt dated September 4, 2020, in the amount of $12,788.25, for an item described as "bracelet yellow gold diamond."  The receipt indicates that the payment method was a debit card ending in -4862.  The Bank of America debit card issued in the name of Victim D.A. ends in -4862.  The Cartier records indicate that the purchaser of the bracelet was Victim D.A. with TANG's residence address.

///

///

///

### G.   Count Six: Attempted Obstruction of Justice, in violation of 18 U.S.C. § 1503 [MOODY and MINKS]

#### i.   A U.S. Magistrate Judge Authorized seizure warrants for two of MOODY's vehicles.

109.   On April 14, 2022, the Honorable Carolyn K. Delaney signed warrants authorizing the seizure of two vehicles: a 1969 Chevrolet Camaro and a 1956 Chevrolet pickup truck (collectively, the "Vehicles").  *See* E.D. Cal. case numbers 2:22-SW-275-CKD and 2:22-SW-276-CKD.   In summary, MOODY and MINKS participate in fraud schemes targeting EDD and marijuana trafficking, and the illicit proceeds were used to purchase parts for the Vehicles.

#### ii.   FBI agents seized the Vehicles pursuant to the federal warrants.

110.   On April 15, 2022, FBI personnel seized the Vehicles from Rusty's Rod Shop in Cleveland, Georgia, which is located in the Northern District of Georgia.  The Vehicles were seized pursuant to Eastern District of California seizure warrants 2:22-SW-275-CKD and 2:22-SW-276-CKD. FBI personnel arranged for the transportation of the Vehicles to the FBI's Atlanta field office, which is located at 3000 Flowers Road S, Chamblee, Georgia.  Copies of the seizure warrants were left with the owner of Rusty's Rod Shop.  After the seizure, the owner of Rusty's Rod Shop informed the owner of the Vehicles, MOODY, that the Vehicles had been seized by the FBI and provided MOODY with a copy of the seizure warrants and receipt.

#### iii.   MOODY and MINKS used fake federal court orders to try to steal the Vehicles from the FBI's Atlanta field office.

111.   On May 8, 2022, at approximately 9:30 p.m., a flatbed truck from G1 Towing and Hauling (hereinafter, "G1 Towing") arrived at the FBI's Atlanta field office.  The tow truck driver informed FBI security personnel that he had been directed to retrieve the Vehicles from FBI's custody. The tow truck driver gave FBI security personnel documents, including a document purporting to be an order issued by the Honorable John K. Larkins III, United States Magistrate Judge for the Northern District of Georgia.  The documents purported to order the United States Marshal and FBI to release the Vehicles.  However, the documents were not issued by Judge Larkin.  In fact, they contain several hallmarks of fraudulent court orders, including the presence of multiple case numbers[12] and

---

[12] I used PACER to review records for both case numbers listed in the documents.  Neither case

misidentification of Judge Larkin as a United States District Judge.  In addition, the documents
identified a defendant named David Green as the owner.  I know that no such defendant or owner exists
in this case.  Set forth below are copies of the fraudulent court orders that the tow truck driver presented
to the FBI in Atlanta:



Case 1:22-cv-00556-SDG   Document 2   Filed 04/21/22   Page 1 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Apr 21 2022

KEVIN P. WEIMER, Clerk

By: s/E. Morrell
Deputy Clerk

UNITED STATES OF AMERICA

v.

David Green
owner

Criminal Action

1-22-CR-011

Order

Having read and considered the defense's Motion to Release Property and
**Property and application for good cause shown,**

It is hereby ORDERED that the **PROPERTY** listed be released.

SO ORDERED this 21st day of April, 2022.

JOHN K. LARKINS III
UNITED STATES MAGISTRATE JUDGE

Presented by:

Kyle H. Jarzmik Law, Attoney at Law

Paul Messer, Assistant United States Attorney

ATTEST: A TRUE COPY
CERTIFIED THIS

Date: Apr 21 2022

KEVIN P. WEIMER, Clerk

By: s/E. Morrell
Deputy Clerk

contains an entry for the purported orders that the tow truck driver presented.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MOTOR VEHICLE RELEASE FORM

ATTEST; A TRUE COPY
CERTIFIED THIS
Date Apr 21 2022
KEVIN P. WEIMER, Clerk
By: s/E. Morrell
Deputy Clerk

**The following motor vehicle should be released to:**

Name: ___ CHARLES SINGLETON G1 TOWING AND HAULING ___

Address: ___ 1113 Alford Rd Lithonia GA 30058 ___

Date & time of tow: ___ APRIL 20, 2022 OR ANY DAY THEREAFTER ANYTIME DAY OR NIGHT ___

MV make/model: ___ 1969 CHEVY CAMARO ___

Plate — state/number: **1969 CAMARO GREEN VIN 124679N530962**

**Reason for tow:**

SIEZED PROPERTY. RELEASE PROPERTY TO ANY INDIVIDUAL NAMED IN RELEASE.

_____

12 hour hold. Release _only_ after _____ a.m./p.m.

on _____ (date).

May be released immediately _but_ not to:

_____ (defendant)

**May be released immediately**

**This vehicle is currently being held by:**

Name of tow company: **FBI HEADQUARTERS ATLANTA**

Address: **3000 Flowers Rd S, Chamblee, GA 30341**

Phone: ___ 770-216-3000 ___

**This form must be presented to the tow company for release of this vehicle.**

Authorization: ___ FBI AGENT JOHNSON ___       ___ ATL DIVISION ___
            Please Print Name                    Police ID Number

Signature: ___

_Instructions:_ Inform tow company that it should not release a vehicle following a police tow unless it receives this completed form. Present citizen with signed form for release.



04/21/22

## PROPERTY RELEASE ORDER

RE: DAVID GREEN,
**1969 CAMARO GREEN VIN 124679N530962**

Attention UNITED STATES MARSHAL, FBI, et al, at **3000 Flowers Rd S, Chamblee, GA 30341.**

The above referenced vehicle is <u>ORDERED TO BE RELEASE ANY TIME DAY OR NIGHT AFTER APRIL 21, 2022 IN THE NORTHERN DISTRICT ATLANTA DIVISION.</u>

SUBSEQUENT to initial seized asset, it is hereby determined that the above referenced property be released AUTHORIZED BY UNITED STATES DISTRICT JUDGE JOHN K. LARKINS III.

APRIL 21, 2022
UNITED STATES DISTRICT JUDGE
JOHN K. LARKINS III

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



04/21/22

## PROPERTY RELEASE ORDER

RE: DAVID GREEN,

1956 CHEVROLET PICK TRUCK VIN H255L005288

Attention UNITED STATES MARSHAL, FBI, et al, at <u>3000 Flowers Rd S, Chamblee, GA 30341.</u>

The above referenced vehicle is <u>ORDERED TO BE RELEASE ANY TIME DAY OR NIGHT AFTER APRIL 21, 2022 IN THE NORTHERN DISTRICT ATLANTA DIVISION.</u>

SUBSEQUENT to initial seized asset, it is hereby determined that the above referenced property be released AUTHORIZED BY UNITED STATES DISTRICT JUDGE JOHN K. LARKINS III.

APRIL 21, 2022
UNITED STATES DISTRICT JUDGE
JOHN K. LARKINS III

22    112.    FBI personnel declined to permit the tow truck driver to access the FBI facility or

retrieve the Vehicles.  Instead, FBI personnel told the driver to return the following day during regular

business hours.

25              iv.    **MOODY and MINKS directed the tow truck driver to retrieve the Vehicles.**

26    113.    On May 9, 2022, FBI agents obtained records from G1 Towing in Lithonia, Georgia.

The records indicate that the purported court order and other documents were sent to G1 Towing

personnel from the email address: hellohellohello200@protonmail.com.  Protonmail is a free encrypted

email provider, which is located in Switzerland.  G1 Towing text messages and cell phone call logs

indicate that the person, or persons, who requested that G1 Towing retrieve the Vehicles from the FBI

communicated using telephone number (510) 499-0428 (hereinafter, "Ext. 0428").

114.    FBI agents interviewed the G1 Towing employee who spoke to the person who submitted

the tow request.  The employee said the person who made the request sounded like a male.  The

employee also said that during the call with the male, he heard a female voice in the background.  The

female voice was talking to the male caller.  The employee listened to known recordings of MOODY

and MINKS, which an FBI agent provided.  The employee indicated that the male caller and the female

heard in the background were MOODY and MINKS, respectively.

<strong>v.      G1 Towing recorded MOODY using Ext. 0428.</strong>

115.    On May 10, 2022, a G1 Towing employee, at the direction of the FBI, recorded an

incoming call from Ext. 0428.  I listened to the recording and believe the voice of the caller belongs to

MOODY.  I have previously reviewed a known recording of MOODY's voice and I have spoken to

MOODY in person.  In the recording obtained by the G1 Towing employee, MOODY asked the

employee to go back to the FBI's Atlanta field office and again attempt to tow the Vehicles.

<strong>vi.      MOODY and MINKS continued to corruptly seek the Vehicles.</strong>

116.    On May 13, 2022, at approximately 10:53 a.m., FBI agents obtained GPS coordinates for

the cell phone assigned Ex. 0428, pursuant to a federal search warrant.  The GPS coordinates indicated

the phone was at 19 Benthill Court in Lafayette, California (hereinafter, the "Benthill Court property").

From approximately 12:26 p.m. to approximately 1:43 p.m., GPS coordinates indicated the phone was in

the vicinity of Franklin Street and Ivy Street in San Francisco.  And at approximately 4:50 p.m., GPS

coordinates indicated the phone was at the Benthill Court property.

117.    On May 13, 2022, at approximately 2:57 p.m., the Sacramento FBI field office received a

call from a person who claimed to be an attorney inquiring about Vehicles seized in Atlanta pursuant to

a warrant drafted by an agent in the FBI's Sacramento Division.  On the same day at approximately 6:04

p.m. (Eastern Time), an agent in the FBI's Atlanta Division received a call from the same attorney.  The

attorney inquired about a '69 Chevy Camaro and a '56 Chevy pickup, which that agent helped seize

pursuant to the seizure warrants.  The attorney said he was calling on behalf of the claimant.  In each

1    instance, the attorney requested a call back.

2        118.    On May 17, 2022, I returned the attorney's call. The attorney indicated that his client, the

3 claimant, was MOODY. He also confirmed his office address which is in the vicinity of Franklin Street

4 and Ivy Street in San Francisco. This is the location where the phone assigned Ext. 0428 was located on

5 May 13, 2022.

6        119.    On May 21, 2022, tow trucks again appeared at FBI's Atlanta field office. Again, the

7 driver presented fake federal court orders purporting to authorize the release of the seized vehicles.

8 Again, the drivers were not permitted access to the FBI facility or to retrieve the vehicles. According to

9 toll records provided by the service provider for Ext. 0428, that cell phone was used to contact the tow

10 truck driver and to contact FBI's Atlanta field office.

11        120.    Prior to the tow truck's arrival on May 21, a female caller using the Ext. 0428, called FBI

12 Atlanta Division personnel. The female caller identified herself as "Agent Amanda Wilson with the

13 airport." She went on to say that she had seized a car that needed to be dropped off and asked to be

14 "transferred to the gate [personnel]." She added that the car being dropped off was a 2021 black

15 Mercedes and that the vehicle would be dropped off at 4:00 p.m. by A-Tow.

16        121.    After the tow trucks arrived at FBI's Atlanta field office, FBI personnel received another

17 call from the female using Ext. 0428. This time the female said her name was Eva Washington. She

18 said that an MC tow truck would be pulling up in about 5 minutes and that the driver has the paperwork

19 to pick up a car. The FBI employee asked if the caller was with the FBI. The FBI employee thought the

20 caller said she was with "the RA." Within the FBI, an RA is a Resident Agency. Resident Agencies are

21 smaller offices within an FBI division.[13]

22        122.    On the morning of May 24, 2022, FBI agents observed a silver-colored Range Rover with

23 California license plate 8XUL312 exit the garage of the 19 Benthill Court property. The Range Rover

24 drove to a nearby school, dropped off a child and returned to the property. FBI agents were able to

25 identify the driver of the vehicle as MINKS.

26

27         [13] I played a known recording of MINKS for the FBI Atlanta Division employee who spoke with
the female caller. The FBI employee confirmed that the caller had a female voice but it sounded
28 different than the recording of MINKS.

123.     I reviewed registration information for the Range Rover which indicated the vehicle was leased by Jessica TANG and Myra MINKS.  Later that same day while surveilling MINKS, FBI agents observed MOODY accessing a white GMC truck with California license plate 29380X2.  That truck is registered to MOODY and I have seen that same truck at MINKS' previous residence in Roseville, California.  Surveillance was discontinued while MOODY was driving the GMC truck, but the truck was seen a short time later on video surveillance accessing the driveway of the 19 Benthill Court property.

124.     I reviewed surveillance video depicting the 19 Benthill Court property between May 20, 2022, and May 23, 2022.  On each day, I observed a silver-colored Range Rover entering and exiting the driveway that leads to the property.  I also observed a white GMC truck entering and exiting the driveway to the property.

125.     Agents spoke to an employee of the property management company that leases the 19 Benthill Court property.  In addition, I reviewed records from the property management company.  The records indicate that on or about February 26, 2022, the property was leased to "Khloe Yee Prada."  The monthly rent is $6,950.  According to the property management company's records, the rent has been paid using money orders.  The California driver's license presented to the property management company contains a photo of a person who resembles MINKS.  However, DMV records indicated that the driver's license number on the license the property management received belongs to a male, with a different name, date of birth, and address.

126.     I searched DMV license records and found no record of a Khloe Prada.  I conducted an open-source records check for Khloe Prada.  One of the addresses associated with that name was in Stockton, California.  I saw that same Stockton address in one of MINKS' phones which was seized on June 22, 2021.

### REQUEST TO SEAL

127.     I request that the Court order that all papers in support of this application, including this affidavit and arrest warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may jeopardize that investigation.  Specifically, law enforcement anticipates

executing search warrants and arrest warrants for this investigation in the next week.  Public disclosure of this investigation would likely cause the individuals identified in this affidavit to destroy evidence, change their patterns of behavior, and flee from law enforcement.

## **CONCLUSION**

128.    For the reasons described above, I respectfully submit there is probable cause that:

a.  Quinten Giovanni MOODY and Myra Boleche MINKS, conspired to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

b.  Myra Boleche MINKS falsely assumed and pretended to be an officer or employee acting under the authority of the United States, or a department, agency, or officer thereof, to wit, "Amanda Wilkins," a purported Drug Enforcement Administration ("DEA") Special Agent, in violation of 18 U.S.C. § 912.

c.  Myra Boleche MINKS falsely assumed and pretended to be an officer or employee acting under the authority of the United States, or a department, agency, or officer thereof, to wit, "Cynthia Lee," a purported Assistant United States Attorney for the Northern District of California, in violation of 18 U.S.C. § 912.

d.  Myra Boleche MINKS, with Quinten Giovanni MOODY aiding and abetting, falsely represented herself as an officer, agent, or employee of the United States, to wit, "Betty Yu," a purported law enforcement officer of the United States Department of Justice, and in that assumed character conducted a search of data which was located at the premise of Phone Company 1, in violation of 18 U.S.C. §§ 913 and 2.

e.  Myra Boleche MINKS and Jessica TANG, devised a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises, to wit, submitting a false claim for unemployment benefits to the California Employment Development Department ("EDD") purportedly on behalf of Victim D.A., and thereby causing the mails to be used to carry out an essential part of the scheme, in violation of 18 U.S.C. § 1341.

f.  Quinten Giovanni MOODY and Myra Boleche MINKS, attempted to influence, obstruct, or impede the due administration of justice in Eastern District of California case numbers

1    2:22-SW-275-CKD and 2:22-SW-276-CKD, in violation of 18 U.S.C. § 1503.

2    I swear, under penalty of perjury, that the foregoing information is true and correct to the best of

3   my knowledge, information, and belief.

4

                                                    Respectfully submitted,
5

6                                                    _/s/ John Ogden_____
                                                     John W. Ogden
7                                                    Special Agent
                                                     Federal Bureau of Investigation
8

9

    Subscribed and sworn telephonically
10  pursuant to Fed. R. Crim. P. 4.1 on:        June 1, 2022_____

11

12  The Honorable Jeremy D. Peterson
    United States Magistrate Judge
13

14

15  /s/ Brian A. Fogerty_____
    Approved as to form by:
16  Assistant U.S. Attorney Brian A. Fogerty

17

18

19

20

21

22

23

24

25

26

27

28

**United States v. Quinten Giovanni Moody, et al.**
**Penalties for Criminal Complaint**

**Defendants**
**QUINTEN GIOVANNI MOODY,**
   **a.k.a. Christano Rossi,**
**MYRA BOLECHE MINKS, and**
**JESSICA TANG**


**COUNT 1:**         **QUINTEN GIOVANNI MOODY,**
                     **a.k.a. Christano Rossi,**
               **MYRA BOLECHE MINKS**

VIOLATION:      21 U.S.C. §§ 846, 841(a)(1) – Conspiracy to Distribute Marijuana

PENALTIES:      Imprisonment of at least 5 years and up to 40 years; and
                       Fine of up to $5,000,000; or both fine and imprisonment
                       Supervised release of at least 4 years up to life

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNTS 2 and 3:**  **MYRA BOLECHE MINKS**

VIOLATION:      18 U.S.C. § 912 – False Personation of Officer or Employee of the United
                       States

PENALTIES:      Imprisonment of up to 3 years; or
                       Fine of up to $250,000; or both fine and imprisonment
                       Supervised release of up to 1 year

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNT 4:**         **QUINTEN GIOVANNI MOODY,**
                     **a.k.a. Christano Rossi,**
               **MYRA BOLECHE MINKS**

VIOLATION:      18 U.S.C. § 913 – Impersonator Making a Search

PENALTIES:      Imprisonment of up to 3 years; or
                       Fine of up to $250,000; or both fine and imprisonment
                       Supervised release of up to 1 year

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNT 5:**       **MYRA BOLECHE MINKS**
                   **JESSICA TANG**

VIOLATION:         18 U.S.C. § 1341 – Mail Fraud

PENALTIES:         Imprisonment of up to 20 years; or
                   Fine of up to $250,000; or both fine and imprisonment
                   Supervised release of up to 5 years

SPECIAL ASSESSMENT: $100 (mandatory)

**COUNT 6:**       **QUINTEN GIOVANNI MOODY**
                      **a.k.a. Christano Rossi,**
                   **MYRA BOLECHE MINKS**

VIOLATION:         18 U.S.C. § 1503 – Attempted Obstruction of Justice

PENALTIES:         Imprisonment of up to 10 years; or
                   Fine of up to $250,000; or both fine and imprisonment
                   Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory)